J-A01011-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| LANCE KRUPNICK | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| CYNTHIA KRUPNICK | |
| Appellee | No. 340 EDA 2015 |

Appeal from the Order Entered December 19, 2014
In the Court of Common Pleas of Bucks County
Civil Division at No(s): No. A06-07-60663-D31

BEFORE:  LAZARUS, J., OTT, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:          **FILED FEBRUARY 17, 2016**

Lance Krupnick ("Husband") appeals from the order of equitable distribution entered on December 19, 2014, in the Court of Common Pleas of Bucks County, following a divorce decree entered on May 24, 2012.  We affirm.

The relevant facts and procedural history are as follows: On November 12, 2005, Husband and Cynthia Krupnick ("Wife") were married, and they have one minor child.  On February 22, 2007, Husband filed a complaint in divorce seeking equitable distribution, alimony, and alimony *pendente lite*, and on March 5, 2007, Wife filed an answer and counterclaim in divorce.  On November 18, 2010, the court approved the grounds for divorce and referred the matter to the Office of the Family Master for a conference and hearing.

*Former Justice specially assigned to the Superior Court.

On December 9, 2011, Husband filed a motion for a master's hearing, and on May 23, 2012, following a shortened master's hearing and negotiations, the parties entered a property settlement agreement on the record. Specifically, they agreed the marital home was the sole asset subject to equitable distribution and the home's mortgage was the sole joint debt. N.T., 5/23/12, at 4. The parties agreed that Wife would pay to Husband a buyout sum of his equitable distribution interest in the marital home in the amount of $35,000.00; however, the acquisition of the sum of $35,000.00 would require acquisition by Wife of funds from a loan source. *Id.* Further, if Wife secured a loan, she was to make payment within thirty days, and she was obligated to refinance the property so as to remove Husband as an obligor. *Id.* at 5-6. Moreover, the parties agreed that Wife would maintain exclusive possession of the marital home and would be responsible for any costs of residing therein pending either the buyout or a sale. *Id.* at 7.

However, if Wife was unable to acquire the necessary funds, the parties agreed the marital home would be placed on the market for sale under the terms of the agreement. *Id.* at 4. In such an event, the parties agreed that, within thirty days, each counsel would provide three names for acceptable realtors, and they would jointly choose a realtor. *Id.* at 7-8. If the parties could not agree upon a realtor, the matter would proceed to binding arbitration for the purpose of choosing a realtor. *Id.* at 8. The

parties agreed that, once a realtor was selected, they would list the marital home for the amount recommended by the realtor, and subject to the home being sold to a third party, Wife would be paid $7,314.00 for funds she expended for the repair of an air conditioner. *Id.* 8-10. All other repairs or improvements recommended by the realtor would require both parties' approval and the costs would be reimbursed from the net proceeds to either party who paid for the repair or improvement. *Id.* at 8-9.

The parties' divorce decree was filed on May 24, 2012, and it expressly indicated that the "property settlement agreement entered on May 23, 2012[,] before [the master] is incorporated into this decree and order without merger, but subject to enforcement." Divorce Decree, filed 5/24/12, at 1.

On March 26, 2013, Husband filed a motion for contempt and sanctions contending that, on December 17, 2012, and January 4, 2013, he received notices from the bank that the monthly mortgage payment had not been made on the parties' marital home. Husband averred his counsel sent the notices to Wife's counsel, and in response, Wife's counsel sent a letter stating that Wife "will not be residing in the residence, [Husband] can, if he wishes move back in . . . ." Husband's Motion for Contempt, filed 3/26/13, at 2. Husband alleged that, pursuant to the parties' property settlement agreement, Wife had the obligation to pay the monthly mortgage payment since she had exclusive possession thereof, and her failure to comply

constituted a willful violation of the court order. He further alleged that Wife acted in bad faith by moving out of the home without notice and in violation of the court's order.

On April 25, 2013, Wife filed a response to Husband's motion for contempt, as well as a cross-motion for contempt, wherein Wife averred her failure to pay the mortgage payments was not "willful;" but rather, was due to financial inability. Wife further alleged that Husband was in violation of the parties' property settlement agreement since he refused to cooperate in good faith with the realtor and refused to enter into an agreement of sale with a buyer.

Husband filed a response to Wife's cross-motion for contempt, and on May 6, 2013, a hearing was held before the trial court, at which the parties indicated they had reached an *interim* agreement. Specifically, the parties indicated that, prior to the hearing, they signed an agreement of sale with regard to the marital home for $265,000.00, and closing was scheduled for June 14, 2013. Both parties indicated they would cooperate with the closing, and the proceeds of the sale would be escrowed in the joint names of both parties' attorneys, with no distribution made to either seller except by court order or joint written agreement of the parties. N.T., 5/6/13, at 4. The parties agreed that Wife remained responsible for any unpaid mortgage arrears, and when it was time to distribute the proceeds from the sale, if either party was unsatisfied, they could seek further court action. At the

conclusion of the hearing, the trial court indicated the parties' agreement would be entered as an order of court.

Thereafter, Wife filed a motion for a hearing with regard to equitable distribution, and on December 1, 2014, the matter proceeded to a hearing. At the hearing, the parties established they sold the marital home and the net sale proceeds were $37,251.53. They stipulated that the escrow account in question had a balance of $37,288.30. N.T., 12/1/14, at 9.

Wife requested an equal division of the money in escrow; however, Husband averred that Wife should be responsible for the unpaid principal balance of the mortgage, as well as accrued interest. Further, Husband averred Wife "trashed" the home prior to moving out such that it resulted in them selling the home for a lower price. That is, Husband averred they should have been able to get $290,000.00 or $305,000.00 for the home; however, due to the deteriorated state of the house, caused by Wife, the house sold for only $265,000.00. *Id.* at 5-6. Husband averred it was "a classic case where somebody trashed the house and therefore asked the other party to absorb half of the cost and the loss." *Id.* at 6. Thus, Husband argued that Wife's share of the monies in escrow should be less than his share of the monies. *Id.*

In response, Wife agreed that the unpaid principal balance of the mortgage should be deducted from her share of the escrow account; however, she indicated her and Husband's figures in this regard were not the

same.  *Id.* at 7.  Wife further argued that, pursuant to the parties' May 23, 2012, property settlement agreement, she was to pay only for repairs and improvements that were requested by the listing agent or required by the agreement of sale, and in this case, there was no such request or requirement.  *Id.*

In support of her arguments, Wife testified that, on June 13, 2013, she was contacted by the mortgage company to pay fees.  In this regard, she testified that, as of June of 2013, there was a principal balance of $201,286.29 on the mortgage; however, after additional costs were assessed (including interest, escrow impound, late charges, foreclosure counsel fees, and the initiation of foreclosure costs), the total outstanding balance due to the mortgage company was $211,917.33.  *Id.* at 13.  Wife noted that, pursuant to the parties' agreement, she was to receive a credit of $7,314.00 for an air conditioner.  Wife testified she believed Husband should receive $19,418.41 from the escrow account and she should receive $17,833.00.  *Id.* at 15.

Upon cross-examination, Wife admitted there was damage to the carpet when the house was listed for sale; however, she disagreed there was "heavy damage."  *Id.* at 19.  When confronted with photos of the house's carpets, Wife testified the photos were taken before she had the carpets professionally cleaned in anticipation of the upcoming sale; she testified she paid $500.00 to have the carpets cleaned.  *Id.* at 22.  Moreover, she noted

the carpeting shown in the photos was hard to see because the lighting was poor. *Id.* at 21. Also, Wife testified she had new carpets placed in the basement. *Id.* at 20. Further, she indicated that no buyer asked her to replace the carpets. *Id.* at 23.

Husband testified that, as of November 14, 2012, the balance due on the mortgage was $202,286.29. *Id.* at 24. However, mortgage arrears accrued to $15,689.23 as of July 1, 2013, and when the mortgage was paid off on July 2, 2014, following the sale of the property, the balance was $211,917.33. Husband testified that, if the mortgage would not have gone into arrears, the payoff on the mortgage would have been $185,597.06. *Id.* at 26. Thus, Husband testified that, from the escrowed amount, he was entitled to a total of $51,320.26, which included a credit for the mortgage arrears and fees that accrued with the foreclosure costs, as well as $24,999.00 for damages to the house sustained while Wife had exclusive possession. *Id.* at 27. Husband testified he was additionally entitled to "half of the check from the sale of the house." *Id.* Upon further questioning, Husband agreed that he would be willing to deduct $7,000.00 for the air conditioner, thus entitling him to a total of "$43,320.26[1] plus [his] half of the house from the s[ale]." *Id.* at 28.

_____

[1] Husband mistakenly testified that $51,320.26 (the amount he testified to which he was entitled) minus $7000.00 (a deduction for the air conditioner) totals $43,320.26. In fact, $51,320.26 minus $7000.00 equals $44,320.26.

Husband testified that he visited the marital home sometime in 2013, and the carpets had been ruined by dog urine and fecal matter. *Id.* Husband presented photos showing a "syrupy" substance on a dining room wall, mold around toilets, and kitty litter splattered in the laundry room. *Id.* at 34-41. Husband admitted that some of the areas may have been cleaned by Wife's cleaning service after he took the photos. *Id.* at 40. He also admitted that Wife had the carpet replaced in the basement. *Id.* at 32.

Husband testified that Tom Adams from Tom Adams Windows and Carpets gave him an estimate of $24,999.00 to replace the carpets and make associated repairs to the wood and floor joints. *Id.* at 30-32, 40. Husband testified that he caused none of the damage, and it is his opinion that the house sold for less than the fair market value because of the damage. *Id.* at 38, 46.

On cross-examination, Husband admitted that, at the May 6, 2013, hearing, he agreed to have the property listed for $265,000.00. *Id.* at 41. Also, he admitted that one of the estimates provided to him by Mr. Adams was dated one year after the sale of the property and contained an asterisk indicating that "Mr. Adams must verify [the] sizes before starting the job." *Id.* at 43. Husband explained that he had two estimates, one which included carpeting and one which did not include carpeting.

At the conclusion of the hearing, the trial court ruled as follows:

> I find that it is not appropriate to give [H]usband any credit for repairs based on the evidence that's before me or

alleged damages. I do, however, feel that it is appropriate and the Order that I'm going to enter will credit him so that he will be in the same place as if he would have been had [W]ife, in fact, paid the mortgage.

Therefore, based on the amount that's currently in escrow of $37,288.30, that amount shall be distributed, including all of the adjustments required by the previous orders, so that [Wife] gets $16,985.33 and [Husband] gets $20,302.97.

*Id.* at 54-55.

On December 19, 2014, the trial court entered an order directing the distribution of the escrow account as follows:

The Royal Bank of America Escrow account #1000708444 shall be distributed as follows:
1. [Husband] shall be distributed $20,302.97, via check sent to Linda G. Walters, Esquire[.]
2. Wife] shall be distributed $16,985.33, via check sent to Jessica A. Pritchard, Esquire[.]

Trial Court Order, filed 12/19/14, at 1.

On January 13, 2015, Husband filed a timely, counseled notice of appeal, [2] and all Pa.R.A.P. 1925 requirements have been sufficiently met.

_____

[2] On February 5, 2015, Wife filed a "Motion to Quash Appeal" on the basis Husband's January 13, 2015, appeal was untimely filed since the appealable order was the trial court's oral ruling/docket notation on December 1, 2014, as opposed to the trial court's written December 19, 2014, order. We note the trial court's December 19, 2014, order finally disposed of all outstanding economic claims, including the manner of disbursement of the escrow account, which was not previously set forth by the trial court. Thus, since the December 19, 2014, order settled all of the parties' economic claims, and the divorce decree was entered on May 24, 2012, the December 19, 2014, order is a final, appealable order from which Husband timely appealed on January 13, 2015. *See Fried v. Fried*, 509 Pa. 89, 501 A.2d 211 (1985) (holding issues in divorce are reviewable after entry of divorce decree and resolution of all economic issues); Pa.R.A.P. 903(a) (appeal must be filed
*(Footnote Continued Next Page)*

- 9 -

Husband presents the following "Statement of Questions Involved:"

[1.] Whether the trial court abused its discretion when it made a significant arithmetical error in determining and allocating the net proceeds of the sale of the marital home between the parties[?]

[2.] Whether the trial court abused its discretion by effectively retroactively shifting to [Husband] the entire mortgage obligation for the marital home, in contravention of the Parties' Settlement Agreement[?]

[3.] Whether the trial court abused its discretion in failing to credit [Husband] for the lost value of the marital home resulting from [Wife's] dissipation of the asset[?]

Husband's Brief.[3]

Initially, we note the following well settled standard of review as it

pertains to equitable distribution orders:

> A trial court has broad discretion when fashioning an award of equitable distribution. *Dalrymple v. Kilishek*, 920 A.2d 1275, 1280 (Pa.Super. 2007). Our standard of review when assessing the propriety of an order effectuating the equitable distribution of marital property is "whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure." *Smith v. Smith*, 904 A.2d 15, 19 (Pa.Super. 2006) (citation omitted). We do not lightly find an abuse of discretion, which requires a showing of clear and convincing evidence. *Id.* This Court will not find an "abuse of discretion" unless the law has been "overridden or misapplied or the judgment exercised" was "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record." *Wang v. Feng*, 888 A.2d 882, 887 (Pa.Super. 2005). In determining the propriety of an equitable distribution award, courts must

_(Footnote Continued)_ ——————————

within thirty days after the entry of the order from which the appeal is taken).

[3] Husband did not paginate his brief.

consider the distribution scheme as a whole. *Id.* "[W]e measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights." ***Schenk v. Schenk***, 880 A.2d 633, 639 (Pa.Super. 2005) (citation omitted).

***Biese v. Biese***, 979 A.2d 892, 895 (Pa.Super. 2009).

Though listed as two separate issues in his "Statement of Questions Involved," Appellant has presented a single argument as to his first and second issues. Specifically, he contends that, pursuant to the parties' May 23, 2012, property settlement agreement, Wife was permitted to remain exclusively in the marital home, but she was obligated to make the monthly mortgage payments. However, in December of 2012, she ceased making the mortgage payments. Husband contends that had "[W]ife timely and fully paid her monthly mortgage obligation from December 2012-the date of her first default-until June 2013-the date of sale-the mortgage debt would have declined to $185,597.06[,]" resulting in the parties "realiz[ing] a profit of (at least) $80,000.00 from the sale of the home." Husband's Brief. Thus, he suggests, pursuant to the parties' property settlement agreement, he is entitled to $40,000.00 from the sale of the marital home.

In its opinion, the trial court explained its calculations and reasoning as follows:

> In calculating the amounts due to each party, we add to the amount in escrow $37,288.30 (comprised of the $37,251.53 in net proceeds per the settlement sheet and the $36.77 in

- 11 -

interest earned) [and] the $10,631.64 that was deducted for the portion of the mortgage foreclosure related fees we charged to Wife. This came to $47,631.64,[4] which is the amount of net proceeds that we determined the parties should have received. From that we deducted the $7,314.00 credit that the parties previously agreed Wife was entitled to receive for the air conditioner. This left $40,605.94 that was then divided equally. Husband got half of that or $20,302.97. Wife got her half plus the $7,314.00 less the $10,631.64 for a net to her of $16,985.33.

Husband argues that this "Court did not take into account the $25,000[.00] that [Wife] was responsible for since she did not pay the mortgage of $15,000[.00] resulting in late fees, attorney[']s fees and other costs totaling $10,000[.00]." This statement is incorrect. We did take into account the alleged mortgage arrearages of $15,689.23 and the additional costs of $10,631.04. We gave Husband credit for the $10,631.04, even though we found that he was jointly responsible for the mortgage going into default due to his conduct in delaying the sale of the house to the point that it was not sold until some time after Wife had vacated the property. However, we did not think it was appropriate to award the $15,689.23 in alleged mortgage arrearages to Husband.

As indicated, we recognized that Wife was to pay all costs associated with the home from May 23, 2012[,] forward since she was given exclusive possession of it. However, Husband had a number of requirements he had to meet under the agreement of May 23, 2012, many of which he did not meet. First, Husband was to provide, within 30 days of May 23, 2012, a list of three potential realtors to sell the marital home. Husband failed to do this, and his failure delayed the ultimate sale. According to the May 23, 2012[,] agreement, the parties were to initially list the property at the price recommended by the realtor. However, Husband unilaterally determined that the property should be listed at over $320,000[.00], despite the fact that the realtor showed Husband and Wife comparable homes in the range of

---

[4] $37,288.30 plus $10,631.64 equals $47,919.94, and therefore, the trial court's indication "this came to $47,631.64" appears to be a typographical error. We note the trial court's remaining calculations are correct, when "this came to $47,631.64" is replaced properly with "this came to $47,919.94."

$290,000[.00] and $305,000[.00]. This decision to list the home so high also delayed the ultimate sale of the home. Husband also stalled significantly in accepting an offer of $265,000[.00] for the sale of the property, which the realtor urged Husband and Wife to accept. Husband's delay tactics caused the arrearages to continue to accrue, as Husband was aware that Wife was unable to continue paying the mortgage and that Wife had vacated the marital property.

Because of Husband's tactics, and because we found that the evidence as to the amount of the alleged mortgage arrears was unclear, we did not find that it was appropriate to award Husband by allocating to him any portion of the $15,689.23 in alleged mortgage arrearages. Therefore, we charged Wife with the $10,631.04 in additional fees and otherwise split the escrow amount equally except for the previously agreed to air conditioning credit to Wife.

Trial Court Opinion, filed 3/16/15, at 7-8 (citations to record omitted) (footnote added).

We agree with the trial court's reasoning in this regard and find no abuse of discretion. *See Biese*, *supra*.

With regard to Husband's final issue, Husband argues the trial court erred in failing to take into account the fact Wife dissipated marital assets. Specifically, he contends Wife's failure to make the monthly mortgage payments resulted in the parties listing the house quickly below the fair market value in an effort to avoid foreclosure proceedings. Moreover, he contends Wife permitted the condition of the house to deteriorate while she had exclusive possession thereof. Husband contends the trial court should have reduced Wife's share of the escrow account accordingly.

We agree with Husband that, in fashioning an equitable distribution award, the trial court must consider the depreciation caused by each party

- 13 -

to the marital assets. 23 Pa.C.S.A. § 3502(a)(1–11). However, the weight to be given to this factor depends on the facts of each case and is within the trial court's sound discretion. *Gaydos v. Gaydos*, 693 A.2d 1368, 1376 (Pa.Super. 1997) (*en banc*). Furthermore, "[t]he law is . . . well settled that the trial court can accept all, some or none of the submitted testimony[.]" *Isralsky v. Isralsky*, 824 A.2d 1178, 1185 (Pa.Super. 2003).

Here, in its opinion, the trial court provided the following reasons for rejecting Husband's instant claim:

> [W]e did not ignore the claim for alleged damages to the marital residence. However, . . . we did not choose to award any credit to Husband for these alleged damages for a number of reasons.
> First, Husband submitted into evidence an estimate by Tom Adams to repair alleged damage to the home. The estimate was for $24,999[.00].[5] One of the estimates clearly states that it was provided "based on [a] phone conversation with [Husband] . . . Size verification and layout needed to approve final price." Husband merely received this estimate based upon a professional's visit to the home and review of the alleged damage. We did not believe that the subfloor, or floor joists, needed to be replaced as Husband testified. The photographs submitted into evidence were unclear at best, and we did not find that the evidence supported Husband's extravagant claims. Therefore, we did not find the $24,999[.00] estimate to be appropriate, nor did we find Husband's testimony—on this subject and others—to be credible.

---

[5] Husband submitted into evidence more than one estimate from Tom Adams. One estimate was for $19,500[.00], which Husband explained excluded replacement carpeting and only included fixing the wood and subfloor. Another estimate was for $24,999[.00], which is the estimate Husband insisted th[e trial court] consider, and included replacing the carpeting.

Second, we heard no testimony that this repair work was actually completed by Mr. Adams or any other contractor. Husband seemed merely to imply that the $24,999[.00] in repairs, if paid, would have provided for a higher sale price to a buyer. We did not find that these repairs were actually requested by the listing broker or the buyers much less were actually completed, and therefore we refuse to find that Wife should be responsible for the alleged $24,999[.00].

Third, . . . Wife testified that she paid a professional cleaning company to clean the home prior to closing on the home, a cost for which Wife did not request a credit. We found Wife's testimony to be credible and believed that Wife acted appropriately in hiring, at her own cost, a cleaning company to clean the home prior to closing[.] . . . [W]e did not believe that Wife should have to otherwise be charged for repairs that were never done to the home and probably never needed.

Trial Court Opinion, filed 3/16/15, at 9-10 (footnote in original) (citation to record omitted).

We agree with the trial court's reasoning in this regard and find no abuse of discretion.[6] *See Biese*, *supra*.

For all of the foregoing reasons, we affirm.

Affirmed.

_____

[6] On September 17, 2015, Wife filed an "Application to Dismiss Appeal" on the basis Husband failed to timely file a designation of contents of his reproduced record, as well as various pleadings. We deny this application.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/17/2016